**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24 B 1529 |
| | ) | (Jointly administered) |
| TRP BRANDS LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge David D. Cleary |

**MEMORANDUM OPINION**

These matters come before the court on the following applications for allowance of

administrative expense claims, including stub period rent:

►MJP 1400 LLC ("MJP") Motion for Allowance of Section 503(b)(7) Administrative Expense

Claim for Post-Bankruptcy Services (EOD 523)[1]

►Amended Application and Request of Broadstone TRP Indiana, LLC ("Broadstone") for

Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(a),

503(b)(1)(A) and 365(d)(3) (EOD 531)

►Application and Request of Greenwood Place Commons, LP ("Greenwood Place") for

Allowance and Payment of Administrative Expenses (EOD 538)

►Application and Request of Greyhound Plaza Associates, LP ("Greyhound Plaza") for

Allowance and Payment of Administrative Expenses (EOD 539)

►Application and Request of STORE SPE AVF II 2017-2, LLC ("STORE") for Allowance and

Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(a), 503(b)(1) and

365(d)(3) for Stub Rent and Post-Petition Taxes (EOD 664)

►Application of National Shopping Plazas, Inc. ("National Shopping") for Allowance and

Payment of Administrative Expense Claim (EOD 669)

---

[1] Except when described otherwise, all docket citations are to Case No. 24 B 1529.

Collectively, these will be referred to as the Applications and the applicants will be referred to as the Landlords.

The RoomPlace Furniture and Mattress LLC ("RoomPlace" or "Debtor") filed a response in opposition to each of the Applications, including a combined response to the Applications of Greenwood Place and Greyhound Plaza. Each of the Landlords, except MJP, filed a reply. Greenwood Place and Greyhound Plaza filed an omnibus reply. Following briefing, the court heard oral argument from Debtor and the Landlords at two different settings.

Having reviewed all of the papers filed and considered the arguments of the parties, for the reasons stated below, the court will enter orders approving the Applications to the extent that they seek administrative expense status for the portion of their claims designated as stub period rent. The only exception is Broadstone, whose claim for stub period rent is barred by claim preclusion. To the extent that any Application requests administrative expense status for a different claim, each of those requests is addressed separately.

## I.      BACKGROUND

On February 2, 2024 ("Petition Date"), TRP Brands LLC ("TRP") and RoomPlace (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

> For more than one hundred years, The RoomPlace has been serving the Chicagoland community with a mission of helping families design and furnish the home of their dreams. The company's roots date back to 1912 when Sam Berman, grandfather of the current CEO, opened Harlem Furniture on Harlem Ave. in Chicago's West Town neighborhood. The family-owned business operated as a single store until 1985 when it began to expand in the Chicagoland area. As the company grew to 20 locations, it rebranded as The RoomPlace in 2001….
>
> As of the Petition Date, The RoomPlace operated 27 retail stores in Illinois, Indiana, and Wisconsin[.]

Joint Disclosure Statement for Chapter 11 Plan of Reorganization of TRP Brands LLC and The RoomPlace Furniture and Mattress LLC ("Disclosure Statement"), EOD 585, § III(A)(1).

Shortly after filing their petitions, Debtors filed an application for emergency hearing on eight different motions. Among other relief, Debtors sought the maintenance of certain customer programs, payment of prepetition employee obligations, the ability to use existing bank accounts, continuance of insurance policies and authorization to pay certain taxes as well as deposits to various utilities. The court granted the application, and these motions were heard on February 6, 2024. All of these motions were supported by the declaration of Debtors' president, Valerie Berman-Knight. *See* EOD 15.

On February 7, 2024, RoomPlace filed Debtors' Motion for Entry of an Order (I) Authorizing the Debtor to (A) Enter into the Consulting Agreement, (II) Authorizing and Approving the Conduct of Store Closing Sales, With Such Sales to be Free and Clear of All Liens, Claims, and Encumbrances, (III) Authorizing and Approving the Store Closing Procedures, and (IV) Granting Related Relief ("First Store Closing Motion"). *See* EOD 43. In the First Store Closing Motion, RoomPlace identified eight stores and a distribution center that it decided to close:

--14640 Greyhound Plaza, Carmel, Indiana 46032 ("Greyhound Plaza Location")

--5651 E. 86th Street, Indianapolis, Indiana 46250

--8401 Michigan Road, Indianapolis, Indiana 46268

--8301 E. Washington Street, Indianapolis, Indiana 46219 ("Broadstone Store")

--7609 Shelby Street, Indianapolis, Indiana 46227 ("Greenwood Place Location")

--2575 E. Main Street, Suite 198, Plainfield, Indiana 46168

--2200 W. War Memorial Drive, Peoria, Illinois 61613

--7014B Green Bay Road, Kenosha, Wisconsin 53142

--8301 E Washington Street, Indianapolis, Indiana 46219 ("Broadstone Center" and, with the

Broadstone Store, the "Broadstone Location")

Collectively, these will be referred to as the "First Store Closing Locations".

In the First Store Closing Motion, RoomPlace sought court authority to conduct going-out-of-business sales in the First Store Closing Locations, including three for which Landlords filed Applications. RoomPlace also sought authorization to enter into a consulting agreement with Planned Furniture Promotions, Inc. ("PFP") to conduct those going-out-of-business sales. To facilitate the sales, RoomPlace asked the court to approve "Store Closing Procedures," and to excuse it from "Liquidation Sale Laws."

Three of the Applications relate to leased premises that were not subject to the First Store Closing Motion. MJP was the landlord for a lease with RoomPlace of nonresidential real property at 1400 S. Randall Road, Algonquin, Illinois ("MJP Location"). STORE was the landlord for a lease with RoomPlace of nonresidential real property at 900 E. Boughton Road, Woodridge, Illinois ("STORE Location"). National Shopping was the landlord for a lease with RoomPlace of nonresidential real property at 18150 S. Halsted Street, Homewood, Illinois ("National Shopping Location").

The going-out-of-business sales proved to be insufficient to enable the Debtors to reorganize their business.

> [T]he economic climate of the furniture industry continued to deteriorate during this period, with high interest rates and inflation impacting consumer spending on home goods. The housing market, which slowed down after the post-pandemic home buying boom…did not show signs of rebounding…. Like many retailers, the Debtors continued to struggle to support their reduced store footprint as consumers increasingly purchase goods online.

Disclosure Statement, § III(A)(1).  Eventually, the Debtors filed a motion seeking approval of procedures to close additional locations, leaving only three retail stores.

On June 11, 2025, the court confirmed Debtors' amended chapter 11 plan ("Plan").  *See* EOD 661.  The Plan provides for satisfaction of the claim of Debtors' secured creditor through the issuance of new membership interests in the reorganized debtors.  Unsecured creditors will be paid from a creditor trust, to which all of Debtors' unencumbered assets and certain causes of action were assigned.  Timely-filed administrative expense claims are to be paid according to the treatment described in Article II of the Plan.  The Plan included a bar date for administrative expense claims; all of the Applications that are the subject of this Memorandum Opinion were timely filed.

## II.     THE APPLICATIONS

The Applications before the court today seek allowance of administrative expense claims as follows:

| Applicant | Claim Amount | Statutory Basis for Claim |
|---|---|---|
| MJP | Prepetition rent - $42,304.44<br>Prepetition taxes - $9,303.77<br>Stub period rent - $42,304.44<br>Stub period taxes - $9,303.77 | 11 U.S.C. §§ 503(b)(7) and 503(b)(9) |
| Broadstone | Stub period rent plus interest - $76,292.53 | 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2) |
| Greenwood Place | Stub period rent and additional rents - $43,798.34<br>Unperformed lease obligations - $13,162.44<br>Credit - $29,515.54 | 11 U.S.C. §§ 503(a), 503(b)(1) and 365(d)(3) |
| Greyhound Plaza | Stub period rent and additional rents - $19,837.76<br>Unperformed lease obligations - $16,277.63 | 11 U.S.C. §§ 503(a), 503(b)(1) and 365(d)(3) |

| STORE | Stub period rent - $45,040.94 Postpetition taxes - $389,001.00 | 11 U.S.C. §§ 503(a), 503(b)(1)(A), 503(b)(1)(B)(i) and 365(d)(3) |
|---|---|---|
| National Shopping | Stub period rent - $26,033.30 Other obligations - $30,193.85 | 11 U.S.C. § 503(b)(1)(A) |

### III.      ANALYSIS

#### A.  Introduction

##### 1.  11 U.S.C. § 365(d)(3) does not require payment of stub period rent

Pursuant to 11 U.S.C. § 365(d)(3), a debtor-in-possession must timely perform all obligations "arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."  The payments required under this section are not merely administrative expenses that may be paid at the time a debtor-in-possession confirms its chapter 11 plan. "Timely" performance means payment at the time required by the lease.  "Section 365(d)(3) requiring 'timely performance' places payment of rent before the payment of administrative expenses.  That is true even where the bankruptcy estate is administratively insolvent.  Congress has spoken clearly." *In re Hitz Rest. Grp.*, 616 B.R. 374, 376 (Bankr. N.D. Ill. 2020) (quotation omitted).  *See HA-LO Indus., Inc. v. CenterPoint Props. Tr.*, 342 F.3d 794, 798 (7th Cir. 2003) ("Section 365(d)(3) provides that obligations under an unexpired lease that arise after an order for relief is entered permitting the bankruptcy case to proceed (commonly referred to as arising 'postpetition'), and prior to rejection of the lease ('prerejection'), are to be timely fulfilled under the terms of the lease[.]") (footnote omitted).

Courts are split on the question of whether § 365(d)(3) requires a debtor-in-possession to pay "stub period" rent.  "The term 'stub period' refers to the time remaining after the entry of an

6

order for bankruptcy relief, in a period for which rent was payable prior to the entry of the order

for relief." *In re UAL Corp.*, 291 B.R. 121, 123 (Bankr. N.D. Ill. 2003).

As the *UAL* court described the conflict:

The root conflict between the payment date and proration approaches is a disagreement over when an obligation arises under a lease (since § 365(d)(3) only requires performance of obligations that arise during the option phase). The payment date cases say that there is a plain meaning to this concept in the context of payment obligations—the entire obligation arises when the payment is due. The proration cases hold that the obligation arises on a daily basis during the period that generates the right to payment.

*Id.* at 125.

In this Circuit, however, the law is clear. "[I]n light of the timely payment requirement,

and without reference to the question of when the obligation arose, § 365(d)(3) does not require

payment of the stub period rent[.]" *Id.* at 126–27.[2]

## 2.   11 U.S.C. § 503(b)(1) may encompass stub period rent

Nevertheless, landlords may have a remedy under the Code for the unpaid portion of a

rent obligation that covers the days between the petition date and the next due date for rent under

the lease. "Section 503(b)(1)(A) grants an allowed administrative claim for 'the actual,

necessary costs and expenses of preserving the estate....'.   Section 503(b)(1)(A) fills the stub

period gap created by section 365(d)(3)." *In re ZB Co. Inc.*, 302 B.R. 316, 319 (Bankr. D. Del.

2003).  *See also In re Goody's Fam. Clothing Inc.*, 610 F.3d 812, 817 (3d Cir. 2010) ("Relieving

a landlord under § 365(d)(3) of burdensome administrative procedures, however, does not

foreclose that landlord's ability to use the more burdensome procedures to recover in situations

---

[2] *But see In re Stone Barn Manhattan LLC*, 398 B.R. 359, 367 (Bankr. S.D.N.Y. 2008) ("Under the billing date construction of the statute, as endorsed by the Debtors, landlords would have to provide proof of 'benefit to the estate' during the stub period in exchange for a future (instead of current) claim for payment, after the time-consuming and costly process of notice and a hearing. The billing date approach thus contradicts the plain purpose of the statute, a result to be avoided.")

7

outside the scope of § 365(d)(3).  Put simply, § 365(d)(3) does not supplant or preempt §

503(b)(1).”).

Although Seventh Circuit landlords are not left without recourse for their stub period rent

claims, they must jump through certain hoops to have those claims paid as an administrative

expense.  Whereas § 365(d)(3) requires “timely” payment of rent obligations without the need

for court intervention, administrative expense claims under § 503(b)(1) can be considerably more

complex.  *See In re KDA Grp., Inc.*, 574 B.R. 556, 558 (Bankr. W.D. Pa. 2017) (“A proceeding

under § 365(d)(3), by comparison, can be much more expedient.  It avoids the more rigorous §

503(b)(1) analysis[.]”) (footnote omitted).

First, applicants seeking an administrative expense claim must bring that request before

the court, because § 503(b) only permits courts to allow administrative expenses “[a]fter notice

and a hearing[.]” Second, those applicants must show that their claim is an “actual, necessary”

cost or expense “of preserving the estate[.]” In this Circuit, “a claim will be afforded priority

under § 503 if the debt both (1) arises from a transaction with the debtor-in-possession and (2) is

beneficial to the debtor-in-possession in the operation of the business.”  *Corp. Assets, Inc. v.

Paloian*, 368 F.3d 761, 773 (7th Cir. 2004) (quotations omitted).

Sections 503(b)(1)(A)(i) and (ii) describe certain wages, salaries, commissions and

benefits as examples of the actual, necessary costs and expenses of preserving a bankruptcy

estate.  Since the statute uses the word “including” just before listing those wages and benefits,

however, this court and others have held that the actual, necessary costs and expenses of

preserving the estate “could extend to a variety of other items.  *See, e.g., Matter of Steenes*, 942

F.3d 834 (7th Cir. 2019) (vehicular fines incurred during the course of a Chapter 13 case); *In re

Munce’s Superior Petroleum Products, Inc.*, 736 F.3d 567 (1st Cir. 2013) (state court contempt

8

fine assessed against a debtor-in-possession); *In re Marcal Paper Mills, Inc.*, 650 F.3d 311 (3rd Cir. 2011) (the portion of a multiemployer fund's withdrawal liability claim attributed to postpetition time period)[.]" *In re Concepts Am., Inc.*, 625 B.R. 881, 889–90 (Bankr. N.D. Ill. 2021). *See also In re Yerusha, LLC*, 671 B.R. 495, 499 (Bankr. N.D. Ill. 2025) (granting motion of City of Chicago for allowance of administrative expense claim based on post-petition municipal code violations).

Therefore, although stub period rent is not specifically listed in § 503(b)(1) as an allowed administrative expense, the stub period rent described in the Applications may be entitled to administrative expense priority if the Landlords can show that it arose from a transaction with the debtor-in-possession and was beneficial to the estate in the operation of the business.

**B.  The Transactions that Resulted in a Claim for Stub Period Rent were Between the Landlords and the Debtor-in-Possession**

As described above, stub period rent can qualify for treatment as an administrative expense claim under 11 U.S.C. § 503. Indeed, the payment of rent for the use and occupancy of real estate is generally an actual, necessary cost of a chapter 11 estate. *See Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 627 (3d Cir. 1990) ("There is no question, of course, that the payment of rent for the use and occupancy of real estate ordinarily counts as an 'actual, necessary' cost to which a landlord, as a creditor, is entitled."). *See also In re Sportsman's Warehouse, Inc.*, 436 B.R. 308, 315 (Bankr. D. Del. 2009) ("There is no ambiguity in the Third Circuit's holding that rent is clearly an 'actual, necessary' cost of preserving the estate, since the debtor's survival depends on its ability to pay the landlord for the right to possess the space necessary to conduct its business.") (quotation and footnote omitted).

The Landlords "carry the heavy burden of demonstrating that the stub rent for which they seek payment provided an actual benefit to the estate and that incurring stub rent was necessary

9

to preserve the value of the estate assets." *Goody's*, 610 F.3d at 818 (quotations omitted). They must show by a preponderance of the evidence that their claims are entitled to priority treatment. *See In re DeMert & Dougherty, Inc.*, 227 B.R. 508, 512 (Bankr. N.D. Ill. 1998). "Administrative expense claims should be narrowly construed in order to keep administrative expenses at a minimum and thus preserve the estate for the benefit of all creditors." *Id.* at 513.

RoomPlace does not argue that the Landlords are *precluded* from asserting a claim for an administrative expense priority for stub period rent. *See In re Oldco Tire Distributors, Inc.*, No. 24-12391 (CTG), 2025 WL 3130700, at *5 (Bankr. D. Del. Nov. 7, 2025) ("the Third Circuit held that nothing in § 365(d)(3) precludes a landlord from seeking to recover that stub rent as an administrative claim under § 503(b)(1)") (footnote omitted). Instead, it contends that to the extent the Applications seek administrative expense priority for stub period rent, the Landlords have not satisfied the requirements for an allowable claim under 11 U.S.C. § 503(b)(1).

The elements of an allowable administrative expense claim are that it results from a transaction with the debtor-in-possession and confers a benefit on the estate. *See Corp. Assets*, 368 F.3d at 773.

> [A] claim will be afforded priority under § 503 if the debt both (1) arises from a transaction with the debtor-in-possession and (2) is beneficial to the debtor-in-possession in the operation of the business. This test is, of course, essentially an effort to determine whether the underlying statutory purpose will be furthered by granting priority to the claim in question, and we will apply it in that spirit.

*Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quotations omitted).

In most cases where a claim for administrative priority is based on a failure to pay rent, the debtor's challenge centers on the benefit to the estate. Here, however, both the Debtor and the Landlords agreed that the second element has been satisfied – the estate benefitted from the use of the leased property. RoomPlace conducted business at each of the locations.

Instead, Debtor disputes the existence of the first element.  It contends that the stub period rent did not arise from a transaction with the debtor-in-possession.  *Jartran* tells us that to promote the policy of providing administrative expense status to certain claims, there must be a showing that the *debtor-in-possession* induced the creditor to perform *rather than the prepetition debtor*.  *See Jartran*, 732 F.2d at 587 ("inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority").  Here, RoomPlace rejects the notion that the debtor-in-possession induced the Landlords to perform.

The transactions subject to the claims in the Applications stem from unexpired, commercial leases in which, upon filing the petition, the debtor-in-possession retained a property interest.  *See* Case No. 24 B 1530, EOD 1 and 19 (petition, schedules); 11 U.S.C. § 541(a).  *Compare* 11 U.S.C. § 541(b)(2) ("Property of the estate does not include--… (2) any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title[.]").

Although it is in this case, the postpetition transaction between the parties need not be a voluntary one.  *See Reading Co. v. Brown*, 391 U.S. 471 (1968) (involuntary obligation that arose from a transaction with the debtor-in-possession awarded administrative expense priority); *In re Res. Tech. Corp.*, 662 F.3d 472, 476 (7th Cir. 2011) (explaining that "*Reading* strikes a compromise between the safety interest and the interest in saving bankrupts from premature liquidation: the bankrupt that continues to operate (normally under Chapter 11) must give its tort victims priority access to such assets as the bankrupt estate retains").

11

1. **Section 365 codifies the transactional relationship, and thus the transaction, between a landlord and the debtor-in-possession.**

Each of the Landlords and the Debtor came into the bankruptcy case with an executory contract – the unexpired lease of nonresidential real property. In 11 U.S.C. § 365, Congress provided debtors-in-possession with certain rights regarding executory contracts. Those rights include the ability to use, occupy and possess leased property while determining whether to assume or reject the executory contract. The landlord must continue to perform its obligations during what the *UAL* court described as the debtor-in-possession's "option phase." *See UAL*, 291 B.R. at 124 ("the period during which the debtor in possession or trustee, under the protection of the Bankruptcy Code, is allowed to decide whether or not a lease should be assumed") (footnote omitted).

During that phase, "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services[.]" *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984).

Section 365(d)(3) provides for payment of rent arising postpetition while both parties timely perform their obligations. Although § 365(d)(3) refers to the "trustee," that is because it is a subsection of chapter 3, which applies to cases under chapter 7, 11, 12 or 13. *See* 11 U.S.C. § 103(a). The Code provides, however, that in chapter 11 cases, "a debtor in possession shall have all the rights … and shall perform all the functions and duties … of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). Therefore, an unexpired lease of nonresidential real property is a postpetition transaction between the landlord and the debtor-in-possession.

12

### 2. The concept of inducement

In light of the superior position enjoyed by administrative expense claimants, the Seventh Circuit reminds lower courts to be mindful of the purpose of that priority – encouraging third parties to facilitate reorganization under chapter 11. "Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress." *Jartran,* 732 F.2d at 586.

To further that purpose, the *Jartran* panel found the concept of "inducement" to be evidence sufficient to establish that a prepetition contract between parties was in fact transitioned into a contract with the debtor-in-possession. "When third parties are *induced* to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority." *Id.* (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)).

> To serve the policy of the priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor….
>
> As noted, the reason that *inducement* of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority is rooted in the policies that gave rise to the creation of the priority. Thus, administrative priority is granted to post-petition expenses so that third parties will be moved to provide the goods and services necessary for a successful reorganization.

*Id.* at 587–88 (citations and footnote omitted).

### 3. The leases were transactions with the debtor-in-possession under the Bankruptcy Code and, even if they were not, the Debtor induced the Landlords to perform

Here, the stub period rent obligation to each Landlord arises out of a transaction with the debtor-in-possession. 11 U.S.C. § 365 provides that "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected[.]" 11 U.S.C. § 365(d)(3). That means that during what *UAL* defined as the

"option phase," following the order for relief and until the date of assumption or rejection, the trustee or debtor-in-possession must and can timely perform under the lease. The landlord must do so as well. *See In re Go Fig, Inc.*, No. 08-40116-705, 2009 WL 537090, at *3 (Bankr. E.D. Mo. Feb. 5, 2009) ("the landlord to an unexpired lease must continue to perform upon the terms of that lease, until such time as the lease is assumed or rejected") (footnote omitted). Therefore, there is a transaction – "an exchange or transfer of goods, services, or funds" – between the debtor-in-possession and the landlord of an unexpired, nonresidential lease of real property, arising out of the rights and obligations of section 365 of the Bankruptcy Code, until the lease is assumed or rejected. *See* "Transaction." Merriam-Webster's Collegiate Dictionary, Merriam-Webster, https://unabridged.merriam-webster.com/collegiate/transaction (last accessed January 20, 2026).

Furthermore, even though § 365 explicitly acknowledges that an unexpired, nonresidential lease of real property is a transaction with the debtor-in-possession, in this case the Debtor induced the Landlords to continue performing postpetition.

Upon filing the petition, the Debtors had the right, as do many debtors-in-possession with extensive real estate portfolios, to immediately reject each lease, or to continue to use the properties in question while operating its business. The Code provided the Debtors with the opportunity to stabilize its operations while moving toward confirmation of a chapter 11 plan or some other, viable exit strategy.

In this case, by its actions and representations, the Debtors induced the Landlords to continue to allow them to occupy each of the leased premises, without the need for the Landlords to demand or seek rejection, adequate protection or immediate allowance of a § 503(b) claim.

14

The Debtors dispute this, writing that the Landlords did not identify "a post-petition inducement by the Debtors, other than continued post-petition use of the space. But…mere post-petition usage in which the lessor was a passive bystander is insufficient because there was no post-petition inducement by the Debtors[.]" Response of the Debtors in Opposition to the Motions of (i) Greenwood Place Commons, LP and (ii) Greyhound Plaza Associates, LP for Allowance of an Administrative Expense Claim, EOD 580, at ⸿ 11 ("Greenwood/Greyhound Response").

The Debtors' position, however, is undercut by the actions it took at the beginning of its bankruptcy case. Less than a week after the Petition Date, RoomPlace filed the First Store Closing Motion. It sought court authority to conduct going-out-of-business sales in several locations, including three of the premises for which a stub period rent claim is sought.

According to the First Store Closing Motion, RoomPlace's management team and advisors conducted a performance evaluation, the result of which was that RoomPlace decided to close certain stores and a distribution center. It contracted with PFP to conduct going-out-of-business sales. In support of the First Store Closing Motion, RoomPlace alleged that holding sales at these leased locations would

> provide a method of disposing inventory at locations that the Debtor does not seek to retain, provide liquidity to the Debtor, minimize administrative expenses and provide other necessary benefits to the estate….

> [T]he Store Closings are a critical component of the Debtors' Chapter 11 strategy and approval of the Consulting Agreement will allow the Debtor to conduct the Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estate. The relief requested in this Motion is integral to maximizing the value of the Debtor's estate. It will permit the Debtor to conduct the Store Closings and establish fair and uniform store closing procedures to assist the Debtor and its creditors effectuate [sic] its chapter 11 strategy.

First Store Closing Motion, at ⸿⸿ 14, 18. Among other relief sought, RoomPlace requested approval of "Store Closing Procedures," to be excused from certain "Liquidation Sale Laws" that

15

could "hamper the Debtor's ability to maximize value in selling its inventory" and "a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtor from maximizing value for creditors through the Store Closings." *Id.* at ¶¶ 21-22.

Clearly, the Debtors did more than passively use the leased premises. They "actively sought Court authority to use the Landlords' property postpetition for the benefit of the estate…. More importantly, though, immediately after these cases were commenced the debtors sought and received additional and substantial relief beyond that which the Bankruptcy Code provides every debtor." Omnibus Reply of Greenwood Place Commons, LP and Greyhound Plaza Associates, LP in Support of Applications for Allowance and Payment of Administrative Expenses, EOD 604, at 4. In comparison, "Jartran … performed no act after the filing of the petition that could be construed as an *affirmation* of the placement of the ads." *Jartran*, 732 F.2d at 589 (emphasis added).

Furthermore, Debtors represented at the continued hearing on the First Store Closing Motion that they had spoken with various landlords and resolved their questions. All of these facts belie any contention that the Landlords were passive bystanders who merely allowed the prepetition leases at the First Store Closing Locations to continue in operation.

Even more compelling is the case for the Landlords whose premises were *not* part of the First Store Closing Motion. Debtors filed for relief under chapter 11 at 4:13 p.m. on Friday, February 2, 2024. Less than 24 hours later, Debtors filed an application for emergency hearing on eight different motions, seeking the maintenance of certain customer programs, payment of prepetition employee obligations, the ability to use existing bank accounts, continuance of insurance policies and authorization to pay certain taxes as well as deposits to various utilities. All of these motions were supported by the declaration of their president that indicated that

16

Debtors intended to use their cash collateral in order to "preserve the value of the Estate, continue operations, maintain jobs for at least 493 employees, satisfy its post-petition obligations and provide the working capital needed to maintain its day-to-day operations." Declaration of Valerie Berman-Knight in Support of the Debtors' Chapter 11 Petition and Requests for First Day Relief, EOD 15, at ¶ 44.

The result was that each of the Landlords were induced to continue to allow Debtor to occupy the leased premises. After all, the Landlords had other options. They could have demanded an immediate deadline for rejection of the unexpired leases. They could have sought adequate protection payments or requested allowance of a claim under § 503(b)(1). But instead, relying on the actions and representations of the Debtors that they wished to continue occupying the Locations and to stabilize their operations, the Landlords refrained from taking action. They were induced to participate in a postpetition transaction with the debtors-in-possession.

In *Jartran*, the Circuit left "to another day the problem of what sort of post-petition conduct by the debtor could lead to a conclusion that the contract had been affirmed and that the claimant was thus entitled to administrative priority." 732 F.2d at 591. That problem has been resolved here; the post-petition conduct by the Debtor leads to the conclusion that the Landlords are entitled to administrative priority.

4. **Inducement is additional evidence of a transaction with the debtor-in-possession, but is not necessary to that finding**

Although *Jartran* found inducement to be "crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor," the panel was considering whether to grant administrative expense status to a purchase order. The relationship in *Jartran* arose "out of commitments made before the debtor-in-possession came into existence" and involved a transaction for which "the closing date had passed[.]" Therefore, the court was

17

required to find the existence of "inducement," but it could not be found because the debtor's

"liability … was irrevocably incurred before the petition was filed."  The debtor "did not have to

act at all in order to enjoy the benefits" of the transaction.  *Jartran*, 732 F.2d at 585, 587, 588,

589.

In contrast, the transactions between the Landlords and the Debtor were executory and

based on an unexpired lease of nonresidential real property.  Postpetition, obligations remained

with both parties and arose *under the operation of the Bankruptcy Code*.  "Unlike the claimants

in *Jartran*, who had fully performed their obligation prior to the petition date, the Landlords here

performed postpetition by providing the leased premises to [the debtor]. Unlike the debtor in

*Jartran*, which had no choice about whether or not the ads would be published, [the debtor]

chose to use the premises."  *In re Rhodes, Inc.*, 321 B.R. 80, 92 (Bankr. N.D. Ga. 2005)

(reviewing a request that stub period rent be allowed as an administrative expense).  *See In re*

*Adelphia Bus. Sols., Inc.*, 296 B.R. 656, 665 (Bankr. S.D.N.Y. 2003) ("The 'inducement'

requirement is very much a requirement in the law, but it must be construed in accordance with

common sense—to filter out, as in *Jartran*, claims for administrative expense treatment where

the post-petition benefit is requested pre-petition and/or unwanted by the post-petition debtor-in-

possession, but to require administrative expense treatment where the post-petition benefit is

knowingly accepted and desired, post-petition, by the post-petition debtor-in-possession.")

(footnote omitted).

*Jartran's* reasoning further validates that the transactions in this case, between the

Landlords and the Debtor, support the scope of entitlement to priority treatment as an

administrative expense claim under the Bankruptcy Code.  As the panel wrote, "because priority

should not be afforded unless it is founded on a clear statutory purpose, if the appellants' claim

18

does not comport with the language and underlying purposes of § 503, their claim must fail. Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress." *Jartran*, 732 F.2d at 586 (citation omitted). *See also Concepts*, 625 B.R. at 890 ("Each of those subsections of § 503(b)(3) must be analyzed according to the words Congress chose for the potential allowance of an administrative expense, always keeping in mind that such expenses are construed narrowly.").

### 5. Fairness

Finally, Debtor questions why stub period rent, an otherwise prepetition claim, should be elevated to the priority of an administrative expense. In addition to all of the reasons described above, the answer is found in a pre-Code decision in which the Supreme Court was asked to determine whether a postpetition loss from a fire caused by a receiver's negligent act should be entitled to administrative expense status. The trustee opposed the creditor's request, but the Supreme Court rejected the trustee's position. "In our view the trustee has overlooked one important, and here decisive, statutory objective: *fairness to all persons having claims against an insolvent*." *Reading*, 391 U.S. at 477 (emphasis added). As the First Circuit described it:

> Since the debtor-in-possession is a separate legal entity that is carrying on the business principally for the benefit of the pre-filing creditors, the Court has reasoned that fairness requires that any claims incident to the debtor-in-possession's operation of the business be paid before those of creditors for whose benefit the continued operation of the business was allowed.

*Mammoth Mart*, 536 F.2d at 954. *See Jartran*, 732 F.2d at 588 (quoting *Mammoth Mart* with approval).

Here, using property during the stub period in order to generate income for the other unsecured creditors is unfair to the creditor whose administrative expense claim for stub period rent is denied. The unfairness is inflicted upon the creditor whose property is used by the debtor-

19

in-possession for the benefit of other unsecured creditors no longer extending credit or services to the debtor.

If a claim meets the statutory requirements for an administrative claim under the Bankruptcy Code, denial would be unfair to the movant otherwise entitled to assert its rights and achieve the priority.  The inability to qualify for administrative expense status by many prepetition unsecured creditors of a restructuring debtor does not preclude the rights of those who do qualify for such status under the Code.

Over the years, Congress has addressed fairness relative to the landlord/debtor relationship with many amendments to the Bankruptcy Code.  Congress' sense of fairness at the moment is reflected by the Code and must be applied as written.

For all of the reasons stated above, the court finds that the stub period rent requested in each of the Applications meets the requirements to be an administrative expense under 11 U.S.C. § 503(b)(1).

### C. Requests for Administrative Expense Status Other than Stub Period Rent

Each of the Applications contained requests for administrative expense status other than for stub period rent, or raised additional arguments not addressed above.

### 1. MJP

In addition to its request for stub period rent and taxes, MJP sought administrative expense status for the rent and taxes that came due on January 1, 2024, in the total amount of $51,608.21.  The bases for its request are 11 U.S.C. §§ 503(b)(7) and (b)(9).[3]

---

[3] (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including— …

(7) with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff

As RoomPlace correctly points out in its Response of the Debtors in Opposition to the Motion of MJP 1400 LLC for Allowance of an Administrative Expense Claim, however, "[n]either section is applicable.  Section 503(b)(7) deals with a nonresidential real property lease previously assumed under section 365.  Movant's lease was never assumed. Section 503(b)(9) deals with the value of 'goods' received by the debtor within 20 days. Movant is seeking an administrative claim for taxes and rent; not goods."  EOD 567, at 1.  *See In re Sears Holdings Corp.*, No. 18-23538 (SHL), 2023 WL 3470475, at *3 (Bankr. S.D.N.Y. May 15, 2023) ("[B]ankruptcy courts have looked to the definition of 'goods' in Section 2-105(1) of the UCC in applying Section 503(b)(9)[.]"); 810 ILCS § 2-105 (1) ("'Goods' means all things, including specially manufactured goods, which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2-107).").

The portion of MJP's Application relating to January rent and taxes, which accrued and were billed prepetition for a rental period that concluded prior to the Petition Date, is allowable as a general unsecured claim.  The court will enter an order consistent with this ruling.

---

for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);…and

(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

11 U.S.C. §§ 503(b)(7) and (b)(9).

21

### 2. Broadstone

In its Application, Broadstone requested only the allowance of its stub period rent plus interest as an administrative expense claim.  On December 13, 2024, however, Broadstone filed the Application and Request of Broadstone TRP Indiana, LLC for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 503(a), 503(b)(1)(A), and 365(d)(3) ("December 2024 Application").  *See* EOD 462.  After the parties requested two continuances, the Debtor did not oppose the December 2024 Application, and the court granted it.  *See* EOD 498.

Debtors contend that the relief sought in Broadstone's current Application is barred by res judicata and collateral estoppel, and that Broadstone did not request relief from the order granting the December 2024 Application pursuant to Fed. R. Bankr. P. 9024.  The court will first take up the question of whether res judicata precludes Broadstone from seeking the relief set forth in its Application.

"The effect of a judgment in subsequent litigation is determined by the law of the jurisdiction that rendered the judgment[.]" *In re Catt*, 368 F.3d 789, 790–91 (7th Cir. 2004).  The three elements of res judicata under federal law, which the court will refer to as claim preclusion, are: "identity of claims, identity of parties, and a prior final judgment on the merits." *Perry v. Globe Auto Recycling, Inc.*, 227 F.3d 950, 952 (7th Cir. 2000).

> The doctrine of claim preclusion rests on the pragmatic insight that one fair opportunity to litigate a claim is normally enough. The logjam that would develop if people could take second, third, or nth bites at the apple without restriction would end up greatly delaying, or even denying, access to the courts for people with new claims. By requiring people to raise all theories that relate to a single claim in one proceeding, dispute resolution is accomplished efficiently, people focus their efforts on the main event, and to the extent humanly possible, both factfinding and legal analysis are accurate.

*Daza v. State*, 2 F.4th 681, 683 (7th Cir. 2021).

Broadstone does not dispute that there is an identity of parties and a final judgment on the merits between the December 2024 Application and its current Application. But, it contends that there is no identity of claims. "The pending Stub Rent Request involves different claims that were not litigated in the [December 2024 Application]." Reply in Support of Amended Application and Request of for [sic] Allowance and Payment of an Administrative Expense Claim, EOD 599, at ⁋ 6.

In the December 2024 Application, Broadstone sought an administrative expense claim for taxes accruing following the Petition Date and prior to the date the Debtor rejected its lease. In the Application before the court today, Broadstone requested the allowance of its stub period rent plus interest. Both claims are based on the lease for the Broadstone Location.

For purposes of claim preclusion, "two claims are one … if they are based on the same, or nearly the same, factual allegations." *Barr v. Bd. of Trs. of W. Illinois Univ.*, 796 F.3d 837, 840 (7th Cir. 2015) (quotation omitted). Therefore, the question is whether the claims in the December 2024 Application are based on the same factual allegations as the claims in the Application before the court today.

Broadstone argues that there is not an identity of claims. Although both requests stem from Broadstone's lease with RoomPlace, the rent is described in section 5 and the real estate taxes in section 6. In support of its argument, Broadstone directs the court to *In re Pre-Press Graphics Co., Inc.*, 300 B.R. 902 (Bankr. N.D. Ill. 2003). In that case, the debtor and its vice president of sales ("Nolte") entered into a prepetition employment agreement, which the debtor rejected in August 2002. About five months later, the court ruled on Nolte's claim for payment of post-petition compensation obligations associated with the employment agreement. *Id.* at 905. Four months after that, Nolte filed a second application for allowance of an administrative claim.

23

Debtor argued that the relief sought in the second application was barred by claim preclusion. *Id*.

The *Pre-Press Graphics* court found that the two applications did not arise from the same set of facts. "The facts in dispute in the instant matter arose after August 15, 2002 when the Debtor rejected the Employment Agreement. At the time Nolte's first administrative expense claim arose, the facts which have led to the instant matter had not yet arisen. Therefore, the Court finds *res judicata* does not bar Nolte's present claim." *Id.* at 908.

In this case, however, the Debtors rejected Broadstone's lease on September 30, 2024.[4] At that time, unlike in *Pre-Press Graphics*, all of the facts that led to the Application before the court today had arisen. As the Seventh Circuit explained, litigants must "raise all theories that relate to a single claim in one proceeding[.]" *Daza*, 2 F.4th at 683.

After the court authorized Debtors to reject its lease, Broadstone filed the December 2024 Application. *See* EOD 462. On February 12, 2025, the court entered the order granting the December 2024 Application and allowing Broadstone an administrative expense claim in the amount of $20,658.08. *See* EOD 498. Later, on April 2, 2025, Broadstone filed a second application for administrative expense styled exactly the same as the December 2024 Application. *See* EOD 531. Both applications offered §§ 503 and 365 of the Bankruptcy Code as authority for allowance of the requested claims. Both applications requested allowance of administrative expense claims pursuant to § 503(b)(1)(A). *See* EOD 462, ¶ 17 and EOD 531, ¶ 18. Although Broadstone (without approval) reserved its rights to supplement its initial request

---

[4] Debtor states in its response that the lease was rejected effective September 30, 2024. *See* EOD 580, at ¶ 3. In the motion for entry of an order authorizing Debtors to reject Broadstone's lease, the requested rejection date was August 31, 2024. *See* EOD 253. The order granting the motion provided that the lease rejection might be effective on a different date than that requested in the motion. *See* EOD 264. For purposes of today's decision, the difference is not material.

for administrative expenses based on taxes "at any time prior to any hearing on the Application[,]" it did not do so.  *See* EOD 462, ⁋ 18.  Both applications clearly requested allowance of administrative claims pursuant to § 503, based on various Code provisions for claims arising from the rejected lease.  The Seventh Circuit has rejected attempts to argue that claim preclusion does not apply just because the operative facts needed to prove claims arising from the same events differ slightly.

> That approach would thoroughly undermine claim preclusion and would allow endless litigation as long as a lawyer could identify a slightly different cause of action with one element different from those in the first, second, or third lawsuits between the same parties arising from the same events. We have consistently explained: Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations.

*Czarniecki v. City of Chicago*, 633 F.3d 545, 550 (7th Cir. 2011) (quotation omitted).

Consequently, Broadstone's claims in both Applications arose from its lease with RoomPlace, and all of the facts that gave rise to those claims were present at the time Broadstone filed the December 2024 Application.  Therefore, Broadstone is barred by the doctrine of claim preclusion from its claim for stub period rent in the Application before the court today.

Having found that claim preclusion applies, the court need not consider whether collateral estoppel (issue preclusion)[5] bars the relief sought in Broadstone's Application. Broadstone did not request relief from the order granting the December 2024 Application pursuant to Fed. R. Bankr. P. 9024, nor did it argue in its Reply that it had done so.

At the oral argument held on June 4, 2025, however, Broadstone asked if the court denies its Application based on claim preclusion that it be afforded the opportunity to seek relief under Rule 9024.

---

[5] Neither will the court discuss claim splitting, which Debtor raised at oral argument.

25

The court will enter an order consistent with this Memorandum Opinion, denying Broadstone's Application for the reasons stated above.  If Broadstone chooses to file a motion seeking relief pursuant to Fed. R. Bankr. P. 9024, the court will read and review that motion at the appropriate time.

### 3.  Greenwood Place

In its Application, Greenwood Place sought allowance of stub period rent and additional obligations for the stub period in the total amount of $43,798.34.  As stated above, the court will enter an order allowing this claim as an administrative expense under 11 U.S.C. § 503(b)(1).

Greenwood Place also sought allowance of $13,162.44 as an unperformed lease obligation.  The basis for its request is 11 U.S.C. § 365(d)(3).  Debtors do not dispute the allowance of this amount as an administrative expense, only the timing of the payment, arguing that "[t]he Bankruptcy Code nowhere requires immediate payment of allowed administrative expenses prior to confirmation of a debtor's chapter 11 plan."  Greenwood/Greyhound Response, ¶ 27.

Debtors filed the Greenwood/Greyhound Response prior to confirmation of their chapter 11 plan.  However, the court confirmed the Plan on June 11, 2025.  *See* EOD 661.  The Plan provides for payment of allowed administrative expenses on either the Effective Date, under agreed terms, or as otherwise ordered by this court.  *See id.* at Article II, § 1(a).  Therefore, the court will grant Greenwood Place's request for allowance of $13,162.44 as an administrative expense, and order payment as provided in the Plan.

Finally, Greenwood Place identified a post-petition overpayment in the amount of $29,515.54.  Debtors request that the court enter an order compelling the return of these funds as an unauthorized post-petition transfer.  *See* 11 U.S.C. §§ 549(a) and 550.  Although a request to

recover money or property must be brought as an adversary proceeding, *see* Fed. R. Bankr. P. 7001(a), Debtors contend that the court can waive that requirement.

The court acknowledges that the requirement of an adversary proceeding can be waived. *See In re Corder*, No. 21 B 10189, 2021 WL 6124234, at *1 (Bankr. N.D. Ill. Sept. 15, 2021).  As the putative plaintiffs, however, Debtors are not the party from whom waiver is required. Greenwood Place did not indicate that it waived its right to be served with a summons and complaint, or any of the other due process protections of an adversary proceeding.  Indeed, Debtors did not even file a *motion* seeking relief against Greenwood Place as a contested matter; they requested turnover of the funds in their responsive brief.  *See Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 839 (7th Cir. 2021) (although the "functional, close-enough request" did not deprive the Circuit of appellate jurisdiction, the party "should have filed a formal motion" instead of "invoking Rule 60(b)(5) in its brief in opposition").

By the order being entered today in conjunction with this Memorandum Opinion, Debtors are authorized to pay Greenwood Place $56,960.78 ($43,798.34 stub rent plus $13,162.44 post-petition lease obligations).  Rather than require Debtors to file an adversary proceeding to litigate the recovery of their overpayment, the court is inclined to simply credit Debtors with this overpayment in determining the amount of Greenwood Place's administrative expense claim. However, the court will schedule a hearing to address the setoff of such amounts.

For all of the reasons stated above, the court will enter an order consistent with this ruling.

### 4. Greyhound Plaza

In its Application, Greyhound Plaza sought allowance of stub period rent and additional obligations for the stub period in the total amount of $19,837.76. As stated above, the court will enter an order allowing this claim as an administrative expense under 11 U.S.C. § 503(b)(1).

Greyhound Plaza also sought allowance of $16,277.63 as an unperformed lease obligation. The basis for its request is 11 U.S.C. § 365(d)(3). Debtors do not dispute the allowance of this amount as an administrative expense, only the timing of the payment, arguing that "[t]he Bankruptcy Code nowhere requires immediate payment of allowed administrative expenses prior to confirmation of a debtor's chapter 11 plan." Greenwood/Greyhound Response, ¶ 27.

Debtors filed the Greenwood/Greyhound Response prior to confirmation of their chapter 11 plan. However, the court confirmed the Plan on June 11, 2025. *See* EOD 661. The Plan provides for payment of allowed administrative expenses on either the Effective Date, under agreed terms, or as otherwise ordered by this court. *See id.* at Article II, § 1(a). Therefore, the court will grant Greyhound Plaza's request for allowance of $16,277.63 as an administrative expense, and order payment as provided in the Plan.

For all of the reasons stated above, the court will enter an order consistent with this ruling.

### 5.  STORE

In its Application, STORE sought allowance of stub period rent in the total amount of $45,040.94.

STORE also requested allowance of certain postpetition taxes as an administrative expense claim.  At oral argument, the parties acknowledged that the amount of the requested taxes decreased significantly between STORE's Application and its reply.  They agreed to submit the stub period rent for the court's consideration, and to continue the tax portion of STORE's Application to a future hearing date.

The court will enter an order allowing the stub rent claim as an administrative expense under 11 U.S.C. § 503(b)(1) and continuing the issue of the amount and priority of the postpetition tax claim.

### 6.  National Shopping

In its Application, National Shopping sought allowance of stub period rent in the total amount of $26,033.30.

National Shopping also requested allowance of administrative expense priority for certain other obligations that arose under its lease in the amount of $30,193.85.  At oral argument, the parties agreed to submit the stub period rent for the court's consideration, and to continue the non-stub portion of National Shopping's Application to a future hearing date.

The court will enter an order allowing the stub rent claim as an administrative expense under 11 U.S.C. § 503(b)(1) and continuing the issue of the postpetition tax claim.

## IV.   CONCLUSION

11 U.S.C. § 365(d)(3) does not require payment of stub period rent.  Nevertheless, stub period rent may be allowed as an administrative expense pursuant to 11 U.S.C. § 503(b)(1)(A).  In the matters before the court today, the stub period rent requests submitted in the Applications satisfied the requirements described by the Seventh Circuit to qualify for administrative expense status – they were the result of transactions with the debtor-in-possession, and they benefitted the estate.

For all of the reasons stated above, the court will enter an order with respect to each Application, allowing the stub period rent requests as administrative expenses[6] and ruling on each additional request as described above in Section III(C).

Date: January 23, 2026

DAVID D. CLEARY
United States Bankruptcy Judge

---

[6] With the exception of Broadstone's request, but only because of the application of the claim preclusion doctrine.