**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 24 B 1529 |
| | ) | (Jointly administered) |
| TRP BRANDS LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge David D. Cleary |

**MEMORANDUM OPINION**

This matter comes before the court on the motion of the Creditor Trustee for an order (I) construing the amended joint chapter 11 plan and confirmation order regarding the insulation of trust assets from administrative claims and (II) enforcing the mandatory funding obligations of the Reorganized Debtors, the backstop commitment party, and the other Berman-related parties ("Trustee Motion"). Four parties filed responses: (1) Korpack, Inc.; (2) STORE SPE AVF II 2017-2, LLC; (3) Gensburg Calandriello & Kanter, P.C.; and (4) Furniture Asset Partners LLC ("FAP"). National Shopping Plaza filed a joinder to three of the four responses. The Creditor Trustee filed an omnibus reply ("Reply") to all of the responses. For the reasons stated below, the court will deny the Trustee Motion.

## I. INTRODUCTION

Under the confirmed liquidation plan, the Creditor Trustee acts as a fiduciary for the beneficiaries of the Creditor Trust, administering the plan in accordance with its terms and making distributions to Allowed Administrative Claimants, Allowed Priority Claimants, Class 2 Claimants and Class 3 Claimants. *See* EOD 584, Arts. I(1)(ii) (defining "Creditor Trustee") and IV(12).

The Creditor Trustee contends that the definition of Creditor Trust Assets controls the distribution process to Holders of Allowed Claims and that definition contains a structural allocation of trust assets to be divided among claimants. As a result, the Creditor Trustee argues

that the assets of the Creditor Trust do not fund distributions to Holders of Allowed Administrative Expense Claims.

Not true. The Plan clearly contains separate provisions setting forth the treatment of claims and the method of distribution, once the claims are allowed. *See id.*, Arts. II, III and IV. These distributions are funded from the Creditor Trust Assets and distributed in accordance with the priorities of the Bankruptcy Code. *See id.,* Art. IV(12). Distribution to Holders of Allowed Administrative Expense Claims is reinforced by the terms of the Creditor Trust Agreement which confirms that distribution of the trust assets shall be consistent with the priorities of the Bankruptcy Code and repayment of any Backstop Facility shall be made only after payment of Allowed Administrative Expense Claims, but before Allowed Unsecured Claims. *See* EOD 653, Ex. A ("Creditor Trust Agreement"), § 5.6.

The Creditor Trustee's request to compel funding of the Backstop Facility fares no better. The Creditor Trustee provided no evidence of the Creditor Trust's assets and liabilities as of the measuring date in the Backstop Facility Commitment Letter – information required to trigger funding obligations. Although § 1142 of the Bankruptcy Code permits a court to issue orders necessary for implementation, courts "should refrain from issuing orders directing or authorizing third parties to take action unless the action specifically is called for by the terms of the plan[.]" 8 Collier on Bankruptcy ⁋ 1142.03 (16th 2026). Without evidence that the conditions for triggering the commitment under the Plan terms are present, the court will not order a party to finance the Backstop Facility.

## II. BACKGROUND

On February 2, 2024, TRP Brands LLC ("TRP") and The RoomPlace Furniture and Mattress LLC ("RoomPlace" and collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

> For more than one hundred years, The RoomPlace has been serving the Chicagoland community with a mission of helping families design and furnish the home of their dreams. The company's roots date back to 1912 when Sam Berman, grandfather of the current CEO, opened Harlem Furniture on Harlem Ave. in Chicago's West Town neighborhood. The family-owned business operated as a single store until 1985 when it began to expand in the Chicagoland area. As the company grew to 20 locations, it rebranded as The RoomPlace in 2001.... As of the Petition Date, The RoomPlace operated 27 retail stores in Illinois, Indiana, and Wisconsin[.]

Joint Disclosure Statement for Chapter 11 Plan of Reorganization of TRP Brands LLC and The RoomPlace Furniture and Mattress LLC ("Disclosure Statement"), EOD 585, § III(A)(1). FAP, a Berman-Related Entity, was the Debtor's primary secured creditor and provided use of cash collateral during these cases.

On September 24, 2024, the Debtors, FAP and the Official Unsecured Creditors Committee ("Committee") filed a motion ("Motion to Approve Compromise") seeking court approval for a compromise ("Global Settlement Agreement") reached by and among those parties as well as the Berman-Related Entities.[1] *See* EOD 388. The compromise served as one piece of the puzzle necessary to complete a plan ready for confirmation.

Among other terms of the compromise, the Global Settlement Agreement defines "Net Liquidation Proceeds" as "the cash proceeds from the liquidation of the Debtors' assets … net of

---

[1] The Motion to Approve Compromise states that the "Berman-Related Entities" are defined in the Global Settlement Agreement. They are not. The Global Settlement Agreement *does* define the "Berman Released Entities" as Bruce Berman, Valerie Berman-Knight, FAP, TRP Holdings, Inc., TRP Transportation, LLC, Berman Enterprises, LLC, Furniture Worx LLC, BLB Investment Enterprises, Inc., BBPI, L.L.C., BBPII, L.L.C., BBPIV, L.L.C., BBPV, L.L.C. and BBPVII, L.L.C. and their respective employees, agents, members, partners, shareholders, attorneys, heirs, successors and assigns. *See* EOD 388, Ex. A, § 1(e). These are the same parties who are defined in the *Plan* as the Berman-Related Entities. *See* EOD 584, Art. I(1)(p).

(i) all ordinary and necessary expenses of conducting the Store Closing Sales including, but not limited to, payments under any Closing Store Bonus Plan, (ii) accrued and unpaid postpetition non-Professional payables existing as of the beginning of the Store Closing Sales for the reasonable, necessary costs and expenses of preserving the Estates, and (iii) any Professional Fees and expenses payable under the Monthly Professional Compensation Order." It also provides that the settling parties will support entry of an order, including an order confirming a plan, that provides "the first $500,000 of Net Liquidation Proceeds will be paid to the Debtors and their Estates free and clear of FAP's liens[.]" See *id.*, Ex. A, §§ 1(m) and 4(a).

The court entered an order approving the Motion to Approve Compromise on October 28, 2024. *See* EOD 437 ("Compromise Order"). On June 11, 2025, the court confirmed the Amended Joint Chapter 11 Plan of Reorganization of TRP Brands LLC and The RoomPlace Furniture and Mattress, LLC ("Plan"). *See* EOD 584, 661 ("Confirmation Order").

**A. The Plan: Claim Treatment**

The Plan provides for establishment of a creditor trust and distribution of the trust assets pursuant to the terms of the Plan and Creditor Trust Agreement. *See* Plan, Art. IV(12). In Article II, the Plan describes the treatment of administrative, professional, and priority claims. Section 1 states in part that Holders of Allowed Administrative Expense Claims "shall be paid (a) on the Effective Date, an amount, in Cash, by the Debtor equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be mutually agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court." *Id.*, Art. II(1)(a). Holder, Allowed Claim and Administrative Expense Claim are all defined terms in the Plan. *Id.*, Art. I(1)(a), (d) and (hhh).

In Article III, § 2(b), the Plan provides that each Holder of an Allowed Class 2 Claim (General Unsecured Claims) "shall receive a beneficial interest in the Creditor Trust, entitling such Holder of an Allowed Class 2 Claim to a Pro Rata share of the distribution from the Creditor Trust[.]" *Id.*, Art. III(2)(b).

In relevant part, the Plan defines "Holder" to mean "(a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court[.]" *Id.*, Art. I(1)(hhh). As for "Claim," the Plan provides that it has the same meaning as it does in the Bankruptcy Code. *Id.*, Art. I(1)(v).

The Plan defines Allowed Claims to include both Allowed Administrative Expense Claims and Allowed Unsecured Claims:

> **"Allowed Claim"** means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order. "Allowed", when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

*Id.*, Art. I(1)(d).

**B. The Creditor Trust**

At § 14 of Article IV, the Plan provides that on or prior to the Effective Date, the Debtors will establish the creditor trust ("Creditor Trust") and execute the Creditor Trust Agreement. According to the Plan, "the Creditor Trustee shall hold the Creditor Trust Assets pursuant to the terms of this Plan and the Creditor Trust Agreement by engaging in the following activities: (a) pursuing the Causes of Action retained by the Creditor Trust; (b) making all required Distributions to the beneficiaries provided for under the Creditor Trust Agreement; and (c) taking other actions as may be necessary to effectuate any of the foregoing." *Id.*, Art. IV(14)(b).[2] The Creditor Trustee's responsibilities include "monetizing the Creditor Trust Assets" and "[o]bjecting to and resolving Disputed Claims[.]" *Id.*, Art. IV(19)(a)(i)(ii).

The "Creditor Trust Assets" are defined in Article I, § 1(hh):[3]

> **"Creditor Trust Assets"** means: ***(a)*** Cash sufficient to pay (i) in an amount equal to $500,000 pursuant to Paragraph 4.a of the Global Settlement Agreement and, to the extent necessary (ii) all ordinary and necessary expenses of conducting the Store Closing Sales including, but not limited to, payments under any Closing Store Bonus Plan, (iii) accrued and unpaid postpetition non-Professional payables existing as of the beginning of the Store Closing Sales for the reasonable, necessary costs and expenses of preserving the Estates, and (iv) any Professional Fees and expenses payable under the Monthly Professional Compensation Order, ***(b)*** Causes of Action including the Avoidance Actions (but excluding Causes of Action related to assets which revest in the Reorganized Debtors pursuant to this Plan, or pledged to FAP or represent proceeds of FAP's collateral) and all proceeds and recoveries thereof, ***(d)*** any Excluded Assets (as defined below) ***and (e)*** solely related to the foregoing, copies of the books, records and files of the Debtors and of their Estates, in all forms, including electronic and hard copy. ***For the avoidance of doubt, the Creditor Trust Assets shall not include (1)*** the New Membership Interests conveyed to FAP or the FAP Designee, ***(2)*** any Postpetition claims or Causes of Action (other than Avoidance Actions and setoff claims) and Causes of Action that have been expressly released, exculpated or waived by the Debtors or their Estates pursuant to the Global Settlement Agreement, a Final Order of the Bankruptcy Court, or pursuant to this Plan and ***(3)*** any assets that are

[2] The definition of "Creditor Trust" in the Plan refers to Article IV, Paragraph 11. *See* Plan, Art. I(1)(ff). The Creditor Trust is actually described in paragraph 14.

[3] Section hh does not contain a subparagraph (c).

> encumbered by the security interest of FAP. Notwithstanding anything in the Plan to the contrary, the Debtors' Professionals' documents shall not be transferred to the Creditor Trust and shall not be Creditor Trust Assets, but shall be made available upon reasonable request, solely to the extent that such documents are (i) related to the Creditor Trust Assets, (ii) required to administer the Creditor Trust, and (iii) not privileged.

*Id.*, Art. I(1)(hh) (emphasis added). This definition of "Creditor Trust Assets" clearly sets forth the assets included in the Creditor Trust and identifies assets to be excluded.

The Creditor Trust was created pursuant to Article IV(14) of the Plan and the Confirmation Order, for the benefit of Holders. See *id.*, Confirmation Order, and Creditor Trust Agreement, § 2.1. The Creditor Trust Agreement defines "Holder" as "a holder of an Allowed Claim under the Plan as determined from time to time." Creditor Trust Agreement, § 1.2(c). Each Holder acquired a Beneficial Interest in the Creditor Trust, defined as "the rights and interests of each of the Holders in and to the Trust Estate." *Id.*, §§ 1.2(a) and 2.3.

The Creditor Trust Agreement further provides that Beneficial Interests would be distributed to Holders as provided in the Plan. *See id.*, § 3.1. Holders are "entitled to distributions from the Creditor Trust pursuant to the ***priority*** afforded to the Claim of the Holder by the ***Bankruptcy Code***." *Id.*, § 3.2 (emphasis added).

**C. Distributions**

In Article IV, the Plan describes the means for its implementation. Section 2 sets forth the "Sources of Consideration for Plan Distributions."

> The ***Debtors*** shall fund distributions under this Plan with: (i) Cash on hand, including Cash from operations; (ii) the Creditor Trust Assets; (iii) the New Membership Interests; and (iv) proceeds of the Backstop Commitment Letter. Cash payments to be made pursuant to this Plan will be made by the Reorganized Debtors or the Creditor Trustee, as applicable. The Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under this Plan.

Plan, Art. IV(2)(a) (emphasis added).

Section 12 explains how distributions will be made under the Plan:

> Distributions to Allowed Administrative Claimants, Allowed Priority Claimants, Class 2 Claimants and Class 3 Claimants shall be made by the ***Creditor Trustee*** from ***the Creditor Trust Assets***. The Plan will be implemented by, among other things, the establishment of the Creditor Trust, the transfer to the Creditor Trust of the ***Creditor Trust Assets***, and the making of Distributions by the Creditor Trustee in accordance with the Plan and the Creditor Trust Agreement.

*Id.*, Art. IV(12) (emphasis added).

The Plan also clearly permits all entities that hold claims to enforce their claims against the Creditor Trust unless specifically provided otherwise in the Plan. In Article IX, § 1(b), the Plan includes an injunction, which states in relevant part:

> Except as otherwise specifically provided in this Plan or the Confirmation Order, ***all*** Persons or Entities ***who have held, hold or may hold Claims*** or Interests that arose prior to the Effective Date and all other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or Equity Interest in the Reorganized Debtors or property of the Reorganized Debtors, ***other than an action against the Creditor Trust to enforce any right to a distribution pursuant to the Plan***, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtors or property of the Reorganized Debtors, other than an action against the Creditor Trust to enforce any right to a distribution pursuant to this Plan, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the Reorganized Debtors or against the property or interests in property of the Reorganized Debtors, other than an action against the Creditor Trust to enforce any right to a distribution pursuant to this Plan or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtors or against the property or interests in property of the Reorganized Debtors, with respect to any such Claim or Equity Interest.

*Id.*, Art. IX(1)(b) (emphasis added).

**D. Post Confirmation Implementation**

On July 30, 2025, the Committee, the Debtors and FAP executed a letter confirming the occurrence of the Plan's effective date ("Effective Date Letter"). *See* EOD 1064 ("FAP Objection"), Ex. B. These parties agreed

> that (i) all conditions precedent to the Effective Date set forth in Article VIII of the Plan have been satisfied or waived in accordance with the Plan; (ii) the transfers of the Debtors' assets on the Effective Date to the Creditor Trust or the Reorganized Debtors shall occur as set forth on Schedule A attached hereto; and (iii) on the date hereof, the Effective Date shall occur.

*Id.*

The Effective Date Letter included an attached Schedule A that provided a "Claims and Cash Analysis." This analysis allocated $500,000 described as "Global Settlement Agreement Hold Back" to the Creditor Trust, as well as $12,207 in cash, to the Creditor Trust. It also provided that the Creditor Trust was responsible for $512,207 in accounts payable described as "Creditor Trust Admin Claims," while the Reorganized Debtors were responsible for $876,284 in "Reorganized Debtor Assumed Admin Claims." All of those defined "Admin Claims" were listed in a separate tab. Claims for 2024 February Stub Rent were not assigned to either the Creditor Trust or the Reorganized Debtors. Fees for retained professionals were allocated between the Creditor Trust (responsible for the 20% holdback balance) and the Reorganized Debtors. *Id.*

As described earlier, among the "Sources of Consideration for Plan Distributions" were the "proceeds of the Backstop Commitment Letter." Plan, Art. IV(2)(a). The "Backstop Commitment" is defined in the Plan as FAP's commitment "to provide up to a maximum of $150,000 of funding to the Creditor Trust on the Effective Date in accordance with the terms of the Backstop Commitment Letter." *Id.*, Art. I(1)(h). The Backstop Commitment Letter documented the terms of this commitment, including:

> (i) maximum backstop loan amount of $150,000.00 for working capital requirements of the Creditor Trust; (ii) a backstop fee of $10,000, payable only if funds are drawn by the Creditor Trust; (iii) interest rate of 8% for any and all loans drawn by the Creditor Trust; (iv) repayment of any loans drawn, the backstop fee, and any interest accrued will be made from first available net proceeds of Creditor Trust Assets after satisfaction of the Allowed Amount of any Administrative Expense Claims, including the Allowed Administrative Expense Claims of Professionals; provided that such backstop loan repayments shall be made prior to any payments to Allowed General Unsecured Claims and other amounts necessary for administration of the Creditor Trust.

*Id.*, Art. I(1)(i).

The Backstop Commitment Letter further provided how the amount would be determined. No later than 30 days after the Effective Date, if, "after taking into account the transfer of Cash from the Debtors to the Creditor Trust … there is less than $150,000 of Cash available in the Creditor Trust after paying or reserving appropriate amounts with respect to" certain Creditor Trust obligations, then FAP would fund up to $150,000. FAP Objection, Ex. A, § 1.

In its response to the Trustee Motion, FAP does not dispute that the conditions necessary to trigger its funding obligation under the Backstop Commitment Letter were satisfied on the Effective Date. It contends that on July 30, 2025, in accordance with the terms of the Plan, it sent the executed Backstop Facility Commitment Letter to the Committee and the Debtors, committing to provide a backstop facility in an amount not to exceed $150,000 to the Creditor Trust through the origination of an unsecured loan and evidenced by a promissory note. *Id.*, ¶¶ 15, 20 and Ex. A.

According to the FAP Objection, the parties agreed that the Creditor Trustee could call the Backstop Commitment *after* the Effective Date, which would allow him to open a new bank account. In the FAP Objection, FAP summarizes the timeline as follows:

> a. <u>September 15, 2025</u>: Counsel to the Creditor Trust requested funding of the Backstop Commitment.

> b. September 17, 2025: Counsel to FAP informed the Creditor Trust that (i) based on the delay in drawing on the Backstop Commitment on the Effective Date, the funds were invested and the Backstop Commitment could be made in full on October 1, 2025, or in two parts, with $50,000 funded immediately and the balance funded on October 1, 2025, and (ii) that the Creditor Trustee would have to execute the Promissory Note before funding could occur. A copy of the Promissory Note was provided to counsel to the Creditor Trust in that communication.
>
> c. October 1, 2025: FAP was ready and able to fund the Backstop Commitment, but the Creditor Trustee did not respond or execute the Promissory Note.
>
> d. October 9, 2025: Counsel to the Creditor Trust stated that "the Creditor Trust is ready to execute the promissory note – could you send to me the updated for execution?" In response, a revised draft of the Promissory Note was sent to the Creditor Trust. Again, FAP was ready and able to fund the Backstop Commitment, but the Creditor Trust failed to respond or execute the Promissory Note.
>
> e. December 17, 2025: 69 days passed before counsel to the Creditor Trust addressed funding of the Backstop Commitment during a call. On that same day, a draft of the Promissory Note was again sent to the Creditor Trustee and its counsel. Comments were exchanged and wiring instructions sent. A final draft was circulated on December 18, 2025. FAP was again ready and able to fund the Backstop Commitment but, yet again, the Creditor Trustee failed to respond or execute the Promissory Note.
>
> f. April 28, 2026: 131 days after its last communication with respect to the Backstop Commitment, the Creditor Trustee filed its Motion[.]

*Id.*, ⁋ 20 (footnotes omitted). The Creditor Trustee did not dispute these allegations in the Reply.

## III. DISCUSSION

### A. This Court has Jurisdiction to Enforce a Confirmed Plan

In the Trustee Motion, the Creditor Trustee asks the court to interpret the confirmed Plan and to enforce certain funding provisions.

> After confirmation of the plan, the purpose of a bankruptcy case, *i.e.*, dealing efficiently and expeditiously with all matters connected with the bankruptcy estate, is diminished. The diminishment of the purpose effectively contracts the 1334 jurisdiction in the post-confirmation period. Indeed, bankruptcy subject matter jurisdiction following confirmation of a chapter 11 plan has been described as "sharply reduced," and "limited."

*In re Kmart Corp.*, 359 B.R. 189, 195 (Bankr. N.D. Ill. 2005) (citations omitted).

However, the court has "jurisdiction to interpret and enforce its own prior orders." *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). This includes the authority to enforce the provisions of a confirmed plan, because "[a] bankruptcy court retains post-confirmation jurisdiction to protect the confirmation order, to prevent interference with the execution of the plan, and to aid in the plan's operation." *In re Parkland Props., LLC*, 605 B.R. 509, 513 (Bankr. N.D. Ill. 2019). *See also In re Kimball Hill, Inc*., 61 F.4th 529, 533 (7th Cir. 2023) ("This residual jurisdictional authority stems from the Bankruptcy Code through Title 28, which confers subject matter jurisdiction on claims 'arising under' and 'related to' bankruptcy proceedings.").

Moreover, Article X of the Plan provides that, "[n]otwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall … retain such jurisdiction over the Bankruptcy Cases and all Entities with respect to … the Plan as is legally permissible[.]" Plan, Art. X(1)(a). *See, e.g., Travelers*, 557 U.S. at 151 ("What is more, when the Bankruptcy Court issued the 1986 Orders it explicitly retained jurisdiction to enforce its injunctions."). Indeed, Article X § 1(a)(v) specifically provides that the court retains jurisdiction to "decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters … instituted by the Creditor Trustee after the Effective Date[.]" Plan, Art. X(1)(a)(v).

As for the Creditor Trustee's request to enforce funding obligations in the Plan, 11 U.S.C. § 1142 provides the court with statutory jurisdiction to:

> direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b). Although the Creditor Trustee seeks specific performance, which is a request for equitable relief, Fed. R. Bankr. P. 7001(g) permits him to proceed by contested matter rather than adversary proceeding.

For all of these reasons, the court has jurisdiction to interpret and enforce its confirmation order by resolving the Trustee Motion. The burden of proof is on the Creditor Trustee, as the movant. The measure of the Creditor Trustee's burden is the preponderance of the evidence standard.

**B. Plan Interpretation**

As the Seventh Circuit has instructed its lower courts, "[a] confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002), *overruled on other grounds by Moore v. Club Exploria, LLC*, ___ F. 4th ___, 2026 WL 2409841 (7th Cir. Aug. 18, 2026). *See also In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010) ("[U]nlike a private contract, an agreement whose every provision has been approved and therefore activated by court order requires court approval before it may be modified.") (quotation omitted).[4] Therefore, principles of contract law apply to the interpretation of a chapter 11 plan. "And the primary purpose of contract interpretation is to give effect to the *objective* intent of the parties." *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010) (emphasis added).

The plain meaning of a contract's language governs its interpretation by Illinois courts. *See Util. Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) ("Under

[4] The Trustee writes: "Once an agreement is 'approved and therefore activated by court order,' a party may not unilaterally modify its performance or 'choose to comply with the order by some other means.'" Trustee Motion, ⁋ 39 (quoting *Res. Tech.*, 624 F.3d at 382-83). The first quotation is found on page 387, not page 382. The second quotation is not found in *Resource Technology* at all.

Illinois law ... contract terms are interpreted according to their plain meaning unless otherwise defined.”). If the meaning is clear, the court’s inquiry is over. *See Air Safety, Inc. v. Tchrs. Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (“If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence.”).

**1. The Plan does not insulate Creditor Trust Assets from Allowed Administrative Expense Claims**

Article I of the Plan contains definitions of terms used in the Plan. Section 1(hh) is the definition for “Creditor Trust Assets.” The Creditor Trustee argues that the definition of “Creditor Trust Assets” not only defines the assets of the Creditor Trust but also allocates certain of those assets among the Holders of Allowed Claims entitled to distribution under the Plan. The definition of Creditor Trust Assets clearly sets forth the assets to be included or excluded from the Creditor Trust. The definition, however, does not allocate assets to certain creditors or provide a distribution mechanism. To the contrary, the Plan separately provides for claim treatment and implementation. *See* Plan, Arts. II (“Treatment of Administrative, Professional, and Priority Claims”), III (“Classification and Treatment of Claims and Equity Interests”) and IV (“Means For Implementation of the Plan”).

**a. Article I, Section 1(hh) of the Plan defines Creditor Trust Assets**

Despite the clear delineation of defined trust assets and the separate and dedicated treatment and implementation sections of the Plan that follow the priorities of the Code, the Creditor Trustee contends that the definition of Creditor Trust Assets allocates assets among the creditors and thus modifies the specific treatment and implementation sections of the Plan. The Creditor Trustee argues that to protect the proceeds of the causes of action vested in the Creditor Trust “from being diluted by estate-level debts, Article I, Section 1(hh) of the Plan contains a

critical, mandatory exclusion. It provides that the defined 'Creditor Trust Assets': 'shall not include … (ii) any Postpetition claims'." Trustee Motion, ⁋ 7.

Relying on this language, the Creditor Trustee argues that administrative expense claims are "Postpetition claims" as used in § 1(hh), and therefore "the Plan's plain language prohibits these administrative expenses from being satisfied by, or even associated with, the Creditor Trust Assets." *Id.*, ⁋ 8. Three of the responses disagree with the Creditor Trustee's reading of Article I, § 1(hh). *See* EOD 1062, p. 3; EOD 1063, pp. 4-5; EOD 1065, ⁋⁋ 19-23.

The question before the court is whether the plain meaning of "Postpetition claims" resolves this dispute. The court finds that it does.

The word "claim" itself has more than one definition. Interestingly, two of those definitions are opposites. "Claim" is defined in the Bankruptcy Code as a right to payment or to an equitable remedy:

> The term "claim" means--
>
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). In other words, this type of "claim" would be on the liability side of a debtor's balance sheet.

But a "claim" can also be an asset. *See, e.g., Keathley v. Buddy Ayers Constr., Inc.*, 608 U.S. 647, 146 S. Ct. 1532, 1536 (2026) ("for bankruptcy cases proceeding under Chapter 13, the estate also includes property—and therefore claims—that the debtor acquires after the bankruptcy case commences"); *In re Kwok*, 172 F.4th 145, 155 (2d Cir. 2026) ("[R]everse veil-

piercing claims … increase the basket of assets that could be used to satisfy *any and all liabilities* owed by the debtor.") (quotations omitted); *Fat Brands Inc. v. Alagna Advisors LLC*, No. 26 CIV. 3371 (LGS), 2026 WL 1456957, at *1 (S.D.N.Y. May 22, 2026) ("The Notice of Removal asserts that Plaintiff's claims are assets of Plaintiff's bankruptcy estate[.]").

Indeed, the Official Forms use "claim" in both senses of the word. Debtors must list all of their property on Schedule A/B. In answer to Questions 33 and 34 on that Schedule, they must list all "[c]laims against third parties" as well as "[o]ther contingent and unliquidated claims of every nature[.]" In that sense, "claims" are assets. Meanwhile, on Schedules D and E/F, debtors must list their liabilities, including creditors who have claims secured by property and creditors who have unsecured claims.

In Article I(1)(hh) of the Plan, there can be no doubt that when using the phrase "Postpetition claims," the drafters meant "claims" in the sense of an *asset*. First, located in the "Defined Terms" section of the Plan, the phrase being defined is titled "Creditor Trust **Assets**." (Emphasis added.)

Second, the structure of the definition supports this interpretation. The first part of the definition sets forth the assets of the Creditor Trust, and the second part describes those assets that are excluded from the Creditor Trust. Why would the drafters exclude a *liability* from the definition of the assets of the Creditor Trust? An administrative expense claim is not property that the Creditor Trustee could use to make required distributions. However, "Postpetition claims" against third parties are property of the estate that could be liquidated and proceeds distributed to creditors. But, in this Plan, those claims – Postpetition claims – are specifically excluded from the Creditor Trust Assets. The definition is clearly defining assets and functions

solely as a definition of the Creditor Trust Assets. It does not attempt to construct a distribution procedure, allocating assets among the creditors.

The court is not persuaded by the Creditor Trustee's reading of the parenthetical exception "(other than Avoidance Actions and setoff claims)" in Article I(1)(hh) to support his logic that the definition of an asset would reasonably include selective liabilities to exclude. The Creditor Trustee suggests that "a 'setoff claim' under bankruptcy law is categorically never an independent, affirmative asset or standalone lawsuit." Reply, ⁋ 15. Thus, another example of an excluded liability to support his theory. While a setoff claim may not be an "independent" asset, it *is* an asset, just as avoidance actions are assets. *See Bos. & Maine Corp. v. Chicago Pac. Corp.*, 785 F.2d 562, 565 (7th Cir. 1986) ("Setoffs are recognized in state law as contractual rights independent of bankruptcy."). *See also* Schedule B, Question 34 (requiring debtors to list "[o]ther contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims").

The plain meaning of "Postpetition claims" is, as the respondents contend, of "claims" in the sense of an asset.[5] Therefore, "Postpetition claims" in Article I(1)(hh) does not include "administrative expense claims," which are a liability. Consequently, Article I(1)(hh) plainly does not exclude administrative expense claims from the definition of Creditor Trust Assets.

The Creditor Trustee suggests that to read Article I(1)(hh) in this manner "would render the Plan's explicit, independent cash-funding tranches nugatory." Reply, ⁋ 13. This suggestion begs the question of whether the Plan is structured with "explicit, independent cash-funding tranches[.]" Article I(1)(hh) defines Creditor Trust Assets to include several types of assets,

---

[5] The Debtors and the Berman-Related Entities excluded Postpetition claims, which would include claims or "assets" held by the Debtor against Berman-Related Entities. Common sense dictates that any such claims, settled by the Compromise Order, must be excluded as an asset under the Plan.

including cash sufficient to pay certain expenses, causes of action, and assets that FAP provided notice of its intent to abandon (the "Excluded Assets"). But the plain meaning of Article I(1)(hh) does not result in a limit on *who* can receive payment from *which* of the Creditor Trust Assets, as will be discussed further in Section 1(b) below.

For all of these reasons, the court finds that "Postpetition claims" in the definition of "Creditor Trust Assets" does not include administrative expense claims.

**b. Article I, section 1(hh) does not insulate Creditor Trust Assets from Allowed Administrative Expense Claims**

The Creditor Trustee contends that "the Creditor Trust was established pursuant to the Plan and the Liquidating Creditor Trust Agreement for the sole purpose of liquidating the Creditor Trust Assets and making distributions to the Holders of Beneficial Interests." Trustee Motion, ⁋ 2. He bases this contention on the Plan's provisions that holders of allowed class 2 claims (i.e., general unsecured creditors) "shall receive a beneficial interest in the Creditor Trust, entitling such Holder of an Allowed Class 2 Claim to a Pro Rata share of the distribution from the Creditor Trust[.]" Plan, Art. III(2)(b)(ii). Therefore, reasons the Creditor Trustee, holders of administrative expense claims have no legal right to look to Trust assets for recovery.

What the Creditor Trustee's analysis ignores, however, is Article IV, § 12 of the Plan. Section 12 plainly states that "[d]istributions to Allowed Administrative Claimants … shall be made by the Creditor Trustee from the Creditor Trust Assets." The Plan further provides at Article V, § 1 that the Creditor Trustee is required to make those distributions "[o]n the Effective Date, or as soon as reasonably practicable (as determined by the Creditor Trustee) after the Effective Date[.]"

In the Reply, the Creditor Trustee acknowledges that administrative claimants must be paid cash as of the Effective Date, and that he is required by Article IV, § 12 to "act as a

distribution conduit[.]" Reply, ⁋ 10. He argues, however, that administrative claimants are limited to payment from "Cash" as defined in Article I(1)(hh)(a), writing: "If an administrative claimant can simply bypass those specific cash tranches and cannibalize the trust corpus, then the independent, four-tranche structural sequence of Section 1(hh) is stripped of its operational meaning." *Id.*, ⁋ 13. This builds on his argument in the Trustee Motion that the Plan creates "distinct, mutually exclusive buckets" consisting of the "Administrative Funding Bucket" and the "Litigation Corpus Bucket." *See* Trustee Motion, ⁋⁋ 5-7.

In the court's opinion, the Creditor Trustee reads too much into Article I(1)(hh)(a). This section merely defines Creditor Trust Assets and the amount of "Cash" that will make up those Creditor Trust Assets. It does not designate or allocate specific assets to certain creditors. It does not limit administrative claimants to payment only from the "Cash" that becomes part of the Creditor Trust Assets pursuant to Article I, § 1(hh). Instead, as Article IV, § 12 provides, "[d]istributions to Allowed Administrative Claimants … shall be made by the Creditor Trustee *from the Creditor Trust Assets*." Plan, Art. IV(12) (emphasis added). Those Creditor Trust Assets do include "Cash," but they *also* include "Causes of Action including the Avoidance Actions" and "any Excluded Assets[.]" *Id.*, Art. I(1)(hh)(a), (b) and (d).[6]

The Creditor Trustee, citing and quoting 11 U.S.C. § 1129(a)(9)(A), argues that this interpretation ignores the statutory mandate that "Administrative Claims Must Be Paid in Cash as of the Effective Date." Reply, p. 3. He writes in the Reply that "the Plan provides that administrative claims receive cash as of the Effective Date[.]" *Id.*, ⁋ 8.

This assertion is only partially correct. Both § 1129 and the Plan only require payment on the Effective Date to ***allowed*** administrative expense claims. The Plan provides that the

[6] Article I(1)(hh) describes Creditor Trust Assets in sections (a), (b) and (d). There is no section (c).

Creditor Trustee is to make the distributions to Allowed Administrative Claimants. While he should make those distributions on the Effective Date, he may do so only after the claims are allowed and then make the distributions "as soon as reasonably practicable[.]" Plan, Art. V(1). This grace period was necessary because the Plan provides an "Administrative Expense Claim Bar Date" that is the first business day that is thirty days after the Effective Date. *See id.*, Art. I(1)(b). *See also In re Mercon B.V.*, No. 23-11947 (MEW), 2024 WL 4530211, at *2 (Bankr. S.D.N.Y. Oct. 18, 2024) ("The Administrative Claims Bar Date did not even occur until 30 days *after* the Effective Date, and therefore 30 days *after* the escrow account was to be funded. It was quite plain, given the timing, that the original funding could only represent an estimate of what the administrative claims would be, and that the real amounts would be determined later.").

The Creditor Trustee further contends that "[t]he Unsecured Creditors (the Holders) are the 'absolute owners of the Beneficial Interests' and the legal 'grantors' of the Trust." Trustee Motion, ⁋ 30. Again, this suggestion is only partially correct. "Holder" is not defined in the Creditor Trust Agreement as an unsecured creditor, but instead as "a holder of an Allowed Claim under the Plan as determined from time to time." Creditor Trust Agreement, § 1.2(c). Allowed Claims are defined, in relevant part, as both Allowed Administrative Expense Claims and Allowed Unsecured Claims:

> **"Allowed Claim"** means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled

> by a Final Order. "Allowed", when used as an adjective herein (such as ***Allowed Administrative Expense Claim***, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, ***and Allowed Unsecured Claim***), has a corresponding meaning.

Plan, Art. I(1)(d) (emphasis added).

Indeed, the Creditor Trust Agreement states that:

> Holders of Beneficial Interests shall be entitled to distributions from the Creditor Trust ***pursuant to the priority afforded to the Claim of the Holder by the Bankruptcy Code*** and in accordance with the repayment protocol identified in the Plan. Holders of Beneficial Interests arising from General Unsecured Claims shall share ratably in the payment of all expenses, debts, charges, liabilities and obligations with respect to the Creditor Trust.

Creditor Trust Agreement, § 3.2 (emphasis added). If Holders of Beneficial Interests were only unsecured creditors, as the Creditor Trustee suggests, then why would the Creditor Trust Agreement need to clarify that only "Holders of Beneficial Interests arising from General Unsecured Claims" are responsible for the expenses of the Creditor Trust? Clearly, "Holders of Beneficial Interests" are not limited to unsecured creditors.

Equally telling is the specific language of the Plan definition of the Backstop Commitment Letter and section 5.6 of the Creditor Trust Agreement. Contradicting the Trustee's argument, the Plan provides, and the parties agreed, that well after the Effective Date, the Backstop Facility would be paid off from "first available net proceeds of Creditor Trust Assets after satisfaction of the Allowed Amount of any Administrative Expense Claims[.]" Creditor Trust Agreement, § 5.6 and Plan, Art. I(1)(i). The Plan did not contain any "explicit, independent cash-funding tranches."

For the reasons stated above, the court will deny the request of the Creditor Trustee to find that the Creditor Trust's Avoidance Action recoveries, as described in Article I(1)(hh)(b), are legally insulated from, and may not be used to satisfy, any administrative expense claims.

**c. Administrative Claims are not extinguished against the Creditor Trust Assets under the *Airadigm* "dealt with" standard**

The Creditor Trustee argues that if a plan provides a specific treatment for a class of claims, those claimants may rely only on the plan and cannot assert their claims against other assets. Trustee Motion, ⁋ 27 (citing *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 649 (7th Cir. 2008)). Based on this argument, the Creditor Trustee contends that administrative expense "claimants' right to seek recovery was limited to the Debtors' pre-funded cash." *Id.*, ⁋ 29.

The Creditor Trustee's argument relies, however, on his flawed interpretation of the Plan, that "the Plan 'dealt with' the Administrative Expense Claims by providing a specific, exclusive mechanism for their satisfaction: 100% payment in Cash by the Reorganized Debtors on the Effective Date." *Id.*, ⁋ 28. As the court already described above, administrative expense claimants were *not* limited to payment in cash on the Effective Date. Instead, the Plan plainly states that "[d]istributions to ***Allowed*** Administrative Claimants … shall be made by the Creditor Trustee from the Creditor Trust Assets" and that these distributions should be made "[o]n the Effective Date, or as soon as reasonably practicable[.]" Plan, Arts. IV(12) (emphasis added) and V(1). With an Administrative Expense Claim Bar Date well after the Effective Date, plainly not all administrative expense claims were allowed and payable on the Effective Date. When allowed, the Creditor Trustee is required to pay the claims from Creditor Trust Assets.

Therefore, the court will deny the Trustee Motion to the extent that the Creditor Trustee requests a finding that the injunction in Article IX bars any claimant from seeking recovery of Administrative Expense Claims against the Creditor Trust or the Creditor Trust Assets.

**2. Funding Obligations**

In the Trustee Motion's prayer for relief, the Creditor Trustee asks the court to:

--determine that the Berman-Related Entities and FAP are contractually bound to certain funding obligations;

--compel specific performance by FAP to immediately fund the $150,000 Backstop Facility; and

--"direct[] that the Berman-Related Entities fulfill the $500,000.00 Trust Seed Capital mandate[.]"[7] Trustee Motion, pp. 14-15.

**a. Backstop Facility**

The first of the two funding obligations that the Creditor Trustee seeks to compel is the Backstop Facility.

According to the FAP Objection, FAP advised the parties on July 30, 2025, through the Backstop Commitment Letter, that it was ready to fund the $150,000 facility. FAP notified the Creditor Trustee several times over the next few months that it was prepared to fund "but on each occasion the Creditor Trustee failed to execute the Promissory Note." FAP Objection, ⁋ 35. FAP contends that the Creditor Trust now has sufficient proceeds from the Avoidance Actions, so it no longer satisfies the criteria necessary to trigger funding.

The Backstop Commitment Letter states that the amount of FAP's one-time cash contribution through the origination of an unsecured loan shall be determined "no later than 30 days after the Effective Date of the Plan, after taking into account the transfer of Cash from the Debtors to the Creditor Trust sufficient to pay [various obligations] … if there is less than $150,000 of Cash available in the Creditor Trust after paying or reserving appropriate amounts

[7] Although the parties broadly argue whether the Plan was not properly funded, the Creditor Trustee clearly limited his prayer for relief and sought relief from FAP.

with respect to" those various obligations "then the amount of the Contribution shall be the lesser of (i) $150,000 and (ii) such amount that is required for the Creditor Trust to have Cash in an amount up to $150,000 after paying or reserving appropriate amounts with respect to" those various obligations. *Id.*, Ex. A, p. 2.

The court was provided with no evidence regarding the amount of funds in the Creditor Trust or the Creditor Trust's outstanding obligations to pay the expenses described in Article I(1)(hh)(a)(ii), (iii) and (iv) of the Plan. Therefore, the Creditor Trustee has not demonstrated by a preponderance of the evidence that FAP remains obligated to fund the Backstop Commitment.

On the Effective Date, the parties agreed that there were insufficient funds to pay or resolve amounts allocated to the estate. The Backstop Facility, an approved piece of the plan implementation process, served as the negotiated remedy to bridge the deficiency. All claims allocated to the estate were not allowed at that time and the Backstop Facility was not drawn.

For the reasons stated above, the court will deny the Creditor Trustee's request to compel specific performance by FAP to fund the $150,000 Backstop Facility.

**b. $500,000 cash payment**

The Plan defines "Creditor Trust Assets" in part to mean:

> (a) Cash sufficient to pay (i) in an amount equal to $500,000 pursuant to Paragraph 4.a of the Global Settlement Agreement and, to the extent necessary (ii) all ordinary and necessary expenses of conducting the Store Closing Sales including, but not limited to, payments under any Closing Store Bonus Plan, (iii) accrued and unpaid postpetition non-Professional payables existing as of the beginning of the Store Closing Sales for the reasonable, necessary costs and expenses of preserving the Estates, and (iv) any Professional Fees and expenses payable under the Monthly Professional Compensation Order[.]

Plan, Art. I(1)(hh).

The Creditor Trustee contends that the $500,000 in section (i) is "settlement-derived seed capital [that] is additive to – and legally distinct from – the supplemental cash required to satisfy

the operational payables and professional fees identified in the remaining sub-clauses of the Plan's funding formula." Trustee Motion, ⁋ 14. In other words, the Cash that the Creditor Trust expected to receive would be $500,000 *plus* funds sufficient to pay the payables in sections (ii), (iii) and (iv). The Creditor Trustee therefore asks the court to direct the Berman-Related Entities to pay what he describes as $500,000 seed capital.

There are three flaws in the Creditor Trustee's arguments.

First, as FAP points out in its objection, "[t]he $500,000 referenced throughout the Plan and the Global Settlement Agreement was the *Debtors'* obligation, representing the first $500,000 of Net Liquidation Proceeds allocated to the Debtors' estates free and clear of FAP's liens." FAP Objection, ⁋ 2 (emphasis added). The Creditor Trustee asks the court to compel the Berman-Related Entities to pay $500,000, but that funding obligation belonged to the Debtors. The Creditor Trustee contends that the court should apply the Seventh Circuit's reasoning in *Resource Technology* and disregard any argument that the Berman-Related Entities were excused from paying $500,000 because they provided other contributions to the Debtors' reorganization. *See* 624 F.3d at 386 ("Chiplease's failure to comply is not excused by its direct payment of unapproved operating expenses.). Unlike Chiplease, the party in *Resource Technology* who admitted that it never took an action required by a court-approved settlement agreement, the Berman-Related Entities did not have an obligation that they failed to satisfy. That obligation was the Debtors'.

Second, the Creditor Trustee ignores the fact that Schedule A to the Effective Date Letter clearly describes $500,000 of the $512,207 in cash received by the Creditor Trust as "Global Settlement Agreement Hold Back." On that date, the Creditor Trust also received $12,207 and the Reorganized Debtors received $150,868 from the Debtors' current cash. Accounts payable

were estimated at $1,962,050. The Creditor Trust was responsible for $512,207 of those accounts payable; its liability was described as "Creditor Trust Admin Claims." The Creditor Trust received $512,207 on the Effective Date, and, as the parties agreed, there was no "Additional Cash Need[ed] on Effective Date." FAP Objection, Ex. B.

Finally, there is no basis in the language of the Plan or the Creditor Trust Agreement for the Creditor Trustee's contention that the $500,000 cash payment "was intended to serve as a standalone reserve, independent of litigation recoveries, to pay 'all reasonable and reasonably anticipated expenses … relating to the Trust Estate and its administration.'" Trustee Motion, ⁋ 15 (quoting Creditor Trust Agreement, § 5.1).

In support of this contention in paragraph 15, the Creditor Trustee selectively quotes section 5.1 of the Creditor Trust Agreement. In full, however, this section states:

> 5.1 Trust Administrative Fund. *As soon as cash becomes available from the Trust Estate*, *the Trustee shall establish a reserve fund* (the "Trust Administrative Fund") for the payment by the Trustee of all reasonable and reasonably anticipated expenses, debts, charges, liabilities and obligations relating to the Trust Estate and its administration. The initial amount of the Trust Administrative Fund shall be $500,000.00 and shall be funded in such future amounts deemed reasonably necessary by the Trustee in its sole discretion from the Trust Estate. Any balance remaining in the Trust Administrative Fund, after the payment of all expenses, debts, charges, liabilities and obligations intended to be paid therefrom, shall be distributed to Holders as provided in Section 6 hereof. Any monies deposited in the Trust Administrative Fund pursuant to the terms of this Agreement shall be invested in interest-bearing deposits or investments that satisfy the requirements of Section 5.3.2 hereof, and the interest earned thereon shall be credited thereto.

Creditor Trust Agreement, § 5.1 (emphasis added).

Therefore, the very first phrase of § 5.1 undercuts the Creditor Trustee's contention. The $500,000 Trust Administrative Fund was to be established by the Creditor Trustee himself, as soon as cash became available from the Trust Estate. "Trust Estate" is defined as "*any and all property of the Debtors' Estates* which shall be irrevocably assigned, transferred and conveyed to

the Creditor Trust as of the Effective Date." *Id.*, § 1.2(g) (emphasis added). And, as FAP points out in its objection, "[t]his provision is also silent on the Creditor Trustee's claim that the Trust Administrative Fund be 'independent of litigation recoveries.'" FAP Objection, ⁋ 41.

The Plan required the Debtors to transfer $500,000 pursuant to the Global Settlement Agreement. The Debtors did so. The parties agreed that the payment was made. The Plan does not require an additional $500,000 from any party, including the Berman-Related Entities.

For all of the reasons stated above, the court will deny the Trustee Motion to the extent that the Creditor Trustee asks the court to "direct[] that the Berman-Related Entities fulfill the $500,000.00 Trust Seed Capital mandate[.]" Trustee Motion, p. 15.

## IV. CONCLUSION

For all of the reasons stated above, the court finds that: (1) the Creditor Trust is not legally insulated from, and may be used to satisfy, any Administrative Expense Claim; (2) the Article IX Confirmation Injunction does not bar any claimant from seeking recovery of Administrative Expense Claims against the Creditor Trust; (3) FAP will not be compelled to fund the $150,000 Backstop Facility; and (4) the Berman-Related Entities are not required to pay $500,000 to the Creditor Trust. The court will enter an order consistent with this opinion, denying the Trustee Motion.

Date: September 22, 2026

DAVID D. CLEARY
United States Bankruptcy Judge